### In re INTEGRATED HEALTH SERVICES, INC., et al.

**C. Taylor Pickett, Plaintiff,**

v.

**Integrated Health Services, Inc., Defendant.**

**Bankruptcy No. 00–389 MFW. Adversary No. 03–53694.**

United States Bankruptcy Court, D. Delaware.

Jan. 9, 2004.

Alfred Villoch, III, Edmon L. Morton, James L. Patton, Joel A. Waite, Joseph M. Barry, Maureen D. Luke, Robert S. Brady, Sharon M. Zieg, Young Conaway Stargatt & Pickett, LLP, Wilmington, DE, Arthur Steinberg, New York City, Francis G.X. Pileggi, Fox, Rothschild, O'Brien & Frankel, Ian Connor Bifferato, Bifferato, Bifferato & Gentilotti, J. Kate Stickles, Saul, Ewing LLP, Megan Nancy Harper, Landis, Rath & Cobb LLP, Michael G. Busenkell, Morris, Nichols, Arsht & Tunnell, William Pierce Bowden, Ashby & Geddes, Wilmington, DE, for debtors.

Don A. Beskrone, Office of U.S. Trustee, Wilmington, DE, U.S. Trustee.

Anthony M. Saccullo, Charlene D. Davis, Christopher A. Ward, GianClaudio Finizio, The Bayard Firm, Stephanie Ann Fox, Steven K. Kortanek, Klehr, Harrison Harvey Branzburg & Ellers, Wilmington, DE, for Official Committee of Unsecured Creditors.

John C. Demmy, Stevens & Lee, P.C., Wilmington, DE, Leighton Aiken, Owens, Clary & Aiken, LLP, Dallas, TX, for plaintiff.

Dmitry Pilipis, Frederick B. Rosner, Jaspan Schlesinger Hoffman LLP, Wilmington, DE, for Abe Briarwood Corp.

## OPINION [1]

MARY F. WALRATH, Bankruptcy Judge.

This matter is before the Court on the Motion of the plaintiff, C. Taylor Pickett ("Pickett"), for Summary Judgment. Picket seeks a declaration from this Court that the defendant, Integrated Health Services ("IHS"), assigned to him its rights to a membership in the Caves Valley Country Club ("the Membership"). IHS has filed a Cross Motion for Summary Judgment seeking a declaration that the Membership was not assigned to Pickett. For the reasons discussed below, the Court will grant Summary Judgment in favor of IHS.

## I. FACTUAL BACKGROUND

IHS joined the Club as a corporate member in 1993, paying a subscription fee of $75,000. Stock Certificates for preferred and common stock were issued to IHS. IHS held all rights, title and interest to the Membership from 1993 until December 31, 1998, when IHS named Pickett, its Chief Financial Officer, as its "corporate designee" in recognition of Pickett's past services to IHS. This was memorialized in a memorandum from the Chief Executive Officer of IHS to Pickett ("the Elkins Memo"). The Elkins Memo stated that IHS "has assigned to [Pickett] all its rights, title and interest related to the membership." Additionally, the Elkins Memo stated that Pickett would remain the corporate designee unless he resigned the Membership or was terminated by IHS for cause. In 1999, the Club registered Pickett as IHS' designated member.

On February 2, 2000 ("the Petition Date"), IHS and its affiliates (collectively "the Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors continued to manage their businesses and properties as debtors in possession. Following the bankruptcy filing, Pickett served as an officer of IHS until December 31, 2001. At that time, IHS and Pickett mutually agreed that he should leave IHS' employ and executed an agreement with respect to their various rights ("the Letter Agreement"). Pickett continued to enjoy the privileges at the Club and paid the annual dues associated with the Membership after he left IHS' employ.

On January 17, 2002, IHS designated a "new member" for the Membership. However, that "new member" withdrew his name from consideration before any action was taken. On August 7, 2002, IHS made a request of the Club to remove Pickett as the corporate designee. In response to this second attempt, Pickett sent a letter requesting that IHS acknowledge his ownership of the Membership. IHS did not respond to the request. Pickett then filed the instant Complaint seeking a declaration that the Membership was as-

---

**1.** This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

signed to him and, therefore, is not property of the IHS bankruptcy estate.

## II. *JURISDICTION*

This Court has jurisdiction over this matter as a core proceeding pursuant to 28 U.S.C. §§ 1334 & 157(b)(2)(A), (E), (M) & (O).

## III. *DISCUSSION*

The issue presented is whether IHS validly assigned the Club Membership to Pickett.

### A. *Motion for Summary Judgment*

To grant a motion for summary judgment, the court must determine whether the moving party has established that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Rule 56 "mandates an entry of summary judgment, after adequate time for discovery and upon motion against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548. In making that determination, the court must assume that the undisputed facts are true.

### B. *Choice of Law*

■ In deciding whether or not the agreement between IHS and Pickett was an assignment, we must first determine which state's law should apply using the choice of law rules of the forum state. *In re Eagle Enters., Inc.*, 223 B.R. 290, 292 (Bankr.E.D.Pa.1998). Delaware courts apply the "most significant relationship test" as outlined in the Restatement Second of Conflict of Laws. *Edelist v. MBNA America Bank*, 790 A.2d 1249, 1255–56 (Del.Super.Ct.2001). The "most significant relationship test" identifies which state has the most interest in a particular transaction by analyzing the following factors: (a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties. *Id.* at 1256.

■ Here, the Elkins Memo was drafted, sent and received in Maryland. Pickett resides in Maryland. Moreover, the subject matter of the Elkins Memo was a membership in a country club located in Maryland. Consequently, we conclude that Maryland has the "most significant relationship" to this transaction and its law should govern the issue of the validity of the assignment.

### C. *Effect of Nonassignment Clause in the Club's Bylaws*

■■ IHS argues that, even if the Elkins Memo amounts to an assignment, the nonassignment clause contained in the Club's Bylaws rendered the assignment void. Under Maryland law, a contract may provide that it shall not be assignable. *Michaelson v. Sokolove*, 169 Md. 529, 182 A. 458, 459 (1936).

Maryland has not specifically addressed whether the assignor can assert a nonassignability clause as a defense against the assignee. However, other courts have held that a nonassignment clause is a defense available only to the party who was to be protected by such clause. *Paul v. Chromalytics Corporation*, 343 A.2d 622, 626–27 (Del.Super.Ct.1975). The nonassignment clause is a "personal" provision for the benefit of the obligor that will not prevent the subsequent assignment if the

obligor does not assert its rights. *Logan Planing Mill Company v. Fidelity and Casualty Company of New York,* 212 F.Supp. 906, 912 (S.D.W.Va.1962). A nonassignment clause "ordinarily serves to protect the obligor alone and does not affect the legal or equitable rights of the assignor and assignee as between themselves." *Paul,* 343 A.2d at 627.

Other courts go further. The Oklahoma Supreme Court held that the assignor should not be able to "maintain the inequitable position" of arguing that the nonassignability clause prevented him from doing what he did. *In re Kaufman,* 37 P.3d 845, 855 (Okla.2001) (citing *State Farm Fire & Casualty Ins. Co. v. Farmers Ins. Exchange,* 489 P.2d 480, 482 (Okla.1971)).

We find persuasive the holdings of these courts which deny this defense on equitable grounds. Therefore, we conclude that IHS may not use the nonassignability provision in the Club Bylaws as a defense to the purported assignment by IHS.

### D. *Validity of Alleged Assignment*

■ Under Maryland law, the validity of an assignment is determined by the actual intent of the parties. *State of Maryland, Central Collection Unit v. Columbia Medical Plan,* 300 Md. 318, 478 A.2d 303, 309 (1984). The language of the contract is the primary source of determining the intention of the parties. *Turner v. Turner,* 147 Md.App. 350, 809 A.2d 18, 49 (Md.Ct.Spec.App.2002). "Clear and unambiguous language of a written agreement controls, even if the expression is not congruent with the parties' actual intent at the time of the document's creation." *B & P Enter. v. Overland Equip. Co.,* 133 Md. App. 583, 758 A.2d 1026, 1037 (Md.Ct. Spec.App.2000).

■ However, if the agreement is ambiguous, parol or extrinsic evidence is permissible to determine the parties' true intent. *Kobrine, L.L.C. v. Metzger,* 151 Md.App. 260, 824 A.2d 1031, 1039 (Md.Ct. Spec.App.2003). Moreover, what is ambiguous language is a question of law for the court to decide. *Einhorn v. Fleming Foods of Pennsylvania,* 258 F.3d 192, 194 (3d Cir.2001). Language is ambiguous if it is susceptible to different interpretations. *Id.* at 194; *Stanbalt Realty Co. v. Commercial Credit Corp.,* 42 Md.App. 538, 401 A.2d 1043, 1045 (Md.Ct.Spec.App.1979)(citing *Allen v. Steinberg,* 244 Md. 119, 127, 223 A.2d 240 (Md.Ct.Spec.App.1966)). If it is reasonable, the contract must be viewed in its entirety so as to give effect to each clause. *Sagner v. Glenangus Farms, Inc.,* 234 Md. 156, 198 A.2d 277, 283 (Md.Ct. Spec.App.1964). When it is not reasonable to give each term its common meaning, the agreement is ambiguous.

■ In this case, Pickett submitted the Elkins Memo as the only evidence of an assignment. Pickett argues that the language is unambiguous; the Elkins Memo provides that "IHS has assigned to [Pickett] all its rights, title and interest related to the membership."

IHS argues that the language in the Elkins Memo which states "[Pickett] shall remain the IHS designated member" shows that the only intent was to name Pickett as its designated member and that there was never an intent to assign the Membership to him.

We conclude that the Elkins Memo cannot possibly be read consistently because it used two terms which are contradictory. The phrase "assigns all rights" patently conflicts with the phrase that provides that Pickett "will remain corporate designee" only for a limited period. While the use of the word "assigns" would normally indicate an intent to give away the Membership, the phrase "corporate designee" implies that there was only an intent to allow

the use of the corporate membership for a specified time. Thus, we conclude that the Elkins Memo is ambiguous.

 Given the ambiguity in the Elkins Memo, we may consider extrinsic evidence to determine the true intent of the parties. *Kobrine,* 824 A.2d at 1039. Here, there are several facts which suggest an intent only to designate Pickett as the corporate designee and not to assign the Membership to him. First, in keeping with other corporate memberships held by IHS the Membership (valued at $108,000) was carried on IHS' books as a long term asset. Second, IHS paid a $75,000 subscription fee to obtain the Membership, received shares of the Club's common and preferred stock, and at all times retained possession of the Stock Certificates. Third, while section 1.02 of the Club Bylaws prohibiting assignment of corporate memberships may not invalidate the assignment of the Membership, it does shed light on the intention of the two parties at the time of the Elkins Memo. IHS was prohibited by the Bylaws from assigning the Membership without Club approval and Pickett as Chief Financial Officer was aware of (or should have been aware of) the restriction. Finally, Pickett did not report the value of the Membership as compensation received by him from IHS. Nor was it reflected in filings made by IHS with the SEC or in IHS' payroll system. As IHS' Chief Financial Officer, if Pickett believed that an assignment had occurred, he should have insured that it was properly reflected in IHS' financial records.

The above facts support a finding that neither Pickett nor IHS considered the transaction to be an assignment. Instead, we conclude that each acted in accordance with the belief that it was simply a designation and that ownership remained with IHS.

E. *Waiver*

 Moreover, the Debtors argue that, even if we conclude that there was an assignment of the Membership, Pickett waived this right by executing the Letter Agreement at the time he resigned. Paragraph 7(b) of the Letter Agreement states:

(b) [Pickett] waives, relinquishes, releases, acquits, and forever discharges the IHS Group from any and all claims, demands, damages (compensatory and punitive), debts or expenses of any nature arising out of or in any manner connected with [Pickett's] agreements with the IHS Group up to the date on which this Agreement is fully executed, other than as set forth herein.

The Letter Agreement makes no express reference to the Membership or to Pickett retaining any rights to the Membership.

Pickett argues, however, that this language does not prevent his claim to the Membership because the Letter Agreement was executed on December 31, 2001, before his claim arose on January 17, 2002. Pickett, therefore, argues that his claim against IHS is not barred by the Letter Agreement because it arose after the date of the Letter Agreement.

IHS responds that the Letter Agreement does bar this action by Pickett. The Letter Agreement states that Picket waives all claims based on any agreement prior to the execution of the Letter Agreement.

We agree with the Debtor. Pickett incorrectly focuses his argument on the fact that his claim arose after the Letter Agreement. In fact, the Letter Agreement bars claims related to any agreement executed prior to the Letter Agreement, whether or not a claim under that agreement has matured. The Elkins Memo was executed prior to the Letter Agreement

and, therefore, any claim under that Memo is barred by the Letter Agreement.

### F. *Judicial Estoppel*

██ Pickett argues that IHS should be judicially estopped from claiming the Membership as property of its bankruptcy estate. Judicial estoppel bars a litigant from asserting a position that is inconsistent with one it previously took before the court. *Montrose Medical Group Participating Savings Plan v. Bulger*, 243 F.3d 773, 779 (3d Cir.2001).

██ The rationale behind the doctrine of judicial estoppel is to protect the integrity of the judicial process by prohibiting parties from deliberately changing their positions. *New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). Accordingly, bad faith is a prerequisite of judicial estoppel. Judicial estoppel is an "extraordinary remed[y] to be invoked when a party's inconsistent behavior will otherwise result in a miscarriage of justice." *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d 355, 365 (3d Cir.1996)(citing *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 424 (3d Cir.1988)). A court should not employ judicial estoppel unless it is "tailored to address the harm identified" and no lesser sanction would adequately remedy the damage done by the litigant's misconduct. *Klein v. Stahl GMBH & Co. Maschinefabrik*, 185 F.3d 98, 108 (3d Cir.1999)(citing *Republic of Philippines v. Westinghouse Elect. Corp.*, 43 F.3d 65, 73 (3d Cir.1994)).

Courts typically utilize a non-exhaustive list of factors when determining when to employ judicial estoppel. *New Hampshire*, 532 U.S. at 750, 121 S.Ct. 1808. First, a party's subsequent position must be clearly inconsistent with its earlier position. Second, the party must have succeeded in persuading a court to accept the earlier position, so that acceptance of the subsequent inconsistent position in a later proceeding would lead one to believe that the court has been mislead in either one of those positions. That is, judicial estoppel is unwarranted unless the party changed its position in bad faith. Third, the party arguing the inconsistent position would receive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *Id.* at 750–51, 121 S.Ct. 1808.

██ Pickett argues that IHS has violated the integrity of the judicial system because (1) IHS failed to list the Membership as an asset in its bankruptcy Schedules which is inconsistent with IHS' current assertion that it is an asset of IHS, (2) IHS filed the earlier inconsistent position to mislead this Court, and (3) IHS has gotten an unfair advantage as a result of these inconsistent positions because Pickett has paid the dues for the Membership.

In response, IHS argues that it has not asserted inconsistent positions because the Membership was included as a long term asset on its Schedules. Further, IHS asserts that, even if the two positions were inconsistent, any failure to specifically list the asset was not done in bad faith.

We conclude that the facts of this case do not rise to the level warranting judicial estoppel. As of the Petition Date, IHS had over $3 billion in assets. The failure to separately list the Membership (valued at $108,000) on the Debtor's Schedules cannot be viewed as bad faith. There is no separate category on the Schedules for club memberships. Under the miscellaneous category (Other Personal Property), the Debtors identified assets with a value over $271 million. To list separately all assets with a value in excess of $100,000 in this category on the Schedules would have been burdensome and unnecessary.

Furthermore, if there was bad faith, it must be attributed to Pickett himself because as the Chief Financial Officer he vouched for the accuracy of the Schedules by signing them.

In addition, Pickett has failed to show how he has been prejudiced by the Debtors' failure to separately list the Membership on the Schedules. Nor has the Court been misled; the Court has taken no action in reliance on the omission of the Membership from the Schedules.

■ The judicial estoppel remedy is an equitable remedy which is triggered when there is a sense of fundamental unfairness. Here, given the lack of bad faith, lack of actual harm to Pickett, and lack of any judicial action based on the Schedules, we conclude that fundamental unfairness is not present and judicial estoppel is not met.

### G. *Equitable Estoppel*

■ Pickett also argues that IHS should be equitably estopped from claiming the Membership as part of its bankruptcy estate. The burden of proof is on the party claiming estoppel. *United States v. Asmar*, 827 F.2d 907, 912 (3d Cir.1987). In order for a party to prevail on an equitable estoppel argument, it must show that (1) a misrepresentation of fact was made, (2) which it reasonably relied upon and (3) that resulted in an injury to it. *Wheeling–Pittsburgh Steel Corp. v. McCune*, 836 F.2d 153, 162 (3d Cir.1987)(citing *Rosen v. Hotel and Restaurant Employees Union*, 637 F.2d 592, 597 (3d Cir.1981)).

■ Pickett argues that the failure to list the Membership on the Schedules and in the Reorganization Plan was (1) a misrepresentation of fact, (2) which he reasonably relied upon and (3) that resulted in an

injury to him because he paid the Membership dues. IHS argues that the failure to list the Membership as an asset was not a misrepresentation and that, even if Pickett reasonably relied on the Schedules or Plan, he did not suffer any injury.

Here, the facts do not suggest that equitable estoppel is appropriate. First, the failure to specifically list the Membership as an asset was not a misrepresentation of fact. Although it was not separately listed, it was generally included as an asset in the total assets. Second, Pickett has failed to show any injury or harm to him as a result of the alleged misrepresentation. Pickett's claim that he was injured because he paid the dues for the Membership is insufficient. In exchange for his payments, Pickett received access to the Club and privileges as the "designated member" of IHS during that time period.

### H. *Rights to the Membership*

■ Finally, Pickett argues that his rights to the Membership are superior to IHS because, under the Elkins Memo, Pickett is entitled to remain the designated member until Pickett has either resigned the Membership or been terminated by IHS for cause. Neither event has occurred.

Pickett's argument is unavailing. Assuming that the agreement is enforceable as something other than an assignment, IHS' subsequent designation of someone other than Pickett would be a breach of that agreement for which Pickett may be entitled to damages.[2] However, that breach would not make Pickett the owner of the Membership.

### IV. *CONCLUSION*

For the reasons set forth above, this Court finds that IHS did not assign the Caves Valley Country Club Membership to

**2.** As noted in Part E above, however, Pickett has waived any claims he has against IHS

under the Elkins Memo as a result of the Letter Agreement.

Pickett and that the discretionary doctrines of judicial and equitable estoppel do not apply. Accordingly, we deny Pickett's Motion for Summary Judgment and grant IHS' Cross Motion for Summary Judgment.

An appropriate order is attached.

### ORDER

AND NOW, this **9th** day of **JANUARY, 2004**, upon consideration of the Motion by C. Taylor Pickett for Summary Judgment and Integrated Health Services' Cross Motion for Summary Judgment, for the reasons set forth in the accompanying Opinion, it is hereby

**ORDERED** that C. Taylor Pickett's Motion for Summary Judgment is **DENIED**; and it is further

**ORDERED** that Integrated Health Services' Cross Motion for Summary Judgment is **GRANTED**.